In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-1970

IBRAHIM A. ALI,

*Petitioner,*

*v.*

MICHAEL B. MUKASEY, Attorney General
of the United States,

*Respondent.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.

_____

ARGUED MARCH 5, 2008—DECIDED APRIL 4, 2008

_____

Before EASTERBROOK, *Chief Judge*, and MANION and
SYKES, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Ibrahim Ali, a citizen of
Jordan, lived in the United States for more than 20 years
as a permanent resident alien. He might have become a
citizen; his wife and children are citizens; but when he
chose to remain an alien and commit a federal crime, he
put his residence and his family life in jeopardy. His
crime is selling firearms, without a license or required
paperwork, to people not authorized to own them. The
conviction is for conspiracy "to commit any offense against

the United States, or to defraud the United States", in violation of 18 U.S.C. §371. The statutes that the conspirators agreed to violate are 18 U.S.C. §922(a)(1)(A) and §924(a)(1). The immigration judge and Board of Immigration Appeals classified Ali's offense as one "involving moral turpitude", which foreclosed any opportunity for him to seek adjustment of status on the basis of his wife's petition.

Ali concedes that, because his offense is a firearms crime, it is an "aggravated felony" under 8 U.S.C. §1227(a)(2)(A)(iii). That blocks most avenues of discretionary relief. The one that remains open is adjustment of status under 8 U.S.C. §1255(a). Ali is eligible to seek adjustment of status only if he could be readmitted to the United States. His conviction makes him ineligible for admission, but he can seek a waiver of that ineligibility, see 8 U.S.C. §1182(h)—unless his offense is a "crime involving moral turpitude." 8 U.S.C. §1182(a)(2)(A). We are entitled to consider that subject notwithstanding the aggravated felony because the proper classification of an offense is an issue of law. See 8 U.S.C. §1252(a)(2)(D). But "moral turpitude" is a notoriously plastic term—one so ambulatory that some Justices have thought it unconstitutionally vague, see *Jordan v. DeGeorge*, 341 U.S. 223 (1951) (holding the phrase constitutionally adequate, over three dissents). Neither the Criminal Code nor the Immigration and Nationality Act supplies a definition.

When Congress leaves an administrative agency with discretion to resolve a statutory ambiguity, judicial review is deferential. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984); *United States v. Mead Corp.*, 533 U.S. 218 (2001). That principle applies to immigration no less than to other subjects. *INS v. Aguirre-*

*Aguirre*, 526 U.S. 415 (1999). We have several times avoided deciding whether the agency's classification of a crime as one of "moral turpitude" is covered by *Chevron*. See, e.g., *Garcia-Meza v. Mukasey*, No. 07-2215 (7th Cir. Feb. 5, 2008); *Wei Cong Mei v. Ashcroft*, 393 F.3d 737, 739 (7th Cir. 2004). There is little justification for keeping everyone on tenterhooks and requiring counsel to brief this issue over and over again. *Mead* holds that a delegation of authority to an agency by the enactment of a vague statute that the agency must administer confers interpretive latitude on the agency rather than the court (that's the meaning of *Chevron*), provided that the agency uses rulemaking or adjudication to exercise its discretion. "Crime involving moral turpitude" is an open-ended term; the Board and other immigration officials are both required and entitled to flesh out its meaning; and as the Board has done this through formal adjudication the agency is entitled to the respect afforded by the *Chevron* doctrine.

The Board gave two reasons for finding that Ali's crime is one of moral turpitude. One is well-founded in the Board's jurisprudence and thus has all the support that *Chevron* can afford. The other is not—and, as it was applied in this case by a single member of the Board and not based on a precedential opinion issued by a multi-member panel, it lacks that support.

We start with the weak reason. The Board stated that unlicensed commercial trafficking in firearms is morally reprehensible. That view is incompatible with the Board's own precedents, which distinguish between acts that are seen as ethically wrong without any need for legal prohibition (acts wrong in themselves, or *malum in se*), and those that are ethically neutral and forbidden only by

positive enactment (acts wrong because they are so decreed, or *malum prohibitum*). The Board has held that acts that are wrong in themselves, but not those forbidden only by positive enactment, are treated as crimes of moral turpitude. See *Matter of L-V-C-*, 22 I.&N. Dec. 594, 604 (1999); *Matter of Serna*, 20 I.&N. Dec. 579 (1992). Licensing and form-filing requirements are in the category of *malum prohibitum*.

The single member speaking for the Board wrote that firearms licenses are different, because guns "require a license due to their inherent potential risk to the public welfare". That reflects ignorance of this nation's history. Licensing of dealers (and users) of firearms is a recent development; the first version of what is now §922 and §924 was not enacted until 1968; there is nothing inevitable about the current rules. Guns are dangerous, but the choice between licensing (a form of limited control before the fact) and punishment for misuse of firearms is not an obvious one. Knives and other blade weapons are not licensed; their misuse is controlled through sanctions after the fact, which deter future wrongdoing. There are open questions, reflected in *Parker v. District of Columbia v. Heller*, 478 F.3d 370 (D.C. Cir. 2007), cert. granted under the name *District of Columbia v. Heller*, 128 S. Ct. 645 (2007) (argued March 18, 2008), about the extent to which the Constitution's second amendment allows the national government to regulate firearms. One reason why many firearms-control statutes require proof that the accused knew about the law's requirements is precisely that any complex licensing system has unexpected and counterintuitive applications, which people cannot discover by consulting a moral compass. See *Staples v. United States*, 511 U.S. 600 (1994).

The Board's existing precedents link "moral turpitude" to acts wrong in themselves—acts that, as *Matter of Franklin*, 20 I.&N. Dec. 867 (1994), put it, are base or vile, or display indifference to ethical concerns. Doubtless some unlicensed sales of firearms meet that condition. Think of sales to known terrorists or gangsters. But other licensing and documentation offenses pose low risks, see *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492 (7th Cir. 2006), while still others are ambiguous. If all firearms-licensing offenses are to be moved to the "moral turpitude" category, that must be done by the Board as a whole after full deliberation.

The Board was on stronger ground, however, in treating Ali's offense as a species of fraud, which has long been seen as a crime of moral turpitude. See *Jordan*, 341 U.S. at 227–28, 232; *Palmer v. INS*, 4 F.3d 482, 485 n.6 (7th Cir. 1993); *Matter of Kochlani*, 24 I.&N. Dec. 128, 130–31 (2007) (reaffirming the Board's precedents on this issue). Ali does not deny that, if his conviction is for fraud, then he is ineligible for discretionary relief. But he insists that unlicensed dealing in firearms does not entail fraud. If his conviction were under 18 U.S.C. §924(a)(1)(D), as he supposes, Ali might have a point—*Bryan v. United States*, 524 U.S. 184 (1998), on which the agency's brief relies, has nothing to do with moral turpitude—but the actual offense of conviction is 18 U.S.C. §371. That crime may be committed in either of two ways: conspiracy to commit some other federal crime, or conspiracy to defraud the United States. The IJ and Board concluded that Ali's violation of §371 entailed fraud (implying that the subsection of §924 underlying the crime was §924(a)(1)(A)). And with good reason. The judgment of conviction describes the crime as "[c]onspiracy to defraud the United

States." The presentence report adds: "it was further part
of the conspiracy that the defendants misrepresented,
concealed and hid, and caused to be misrepresented[,]
concealed and hidden, the purpose of and the acts done
in furtherance of the conspiracy". The presentence report
also stated that Ali and his confederates sold the guns to
someone who, they believed, would resell them to known
thugs (members of the Latin Kings street gang) in ex-
change for cocaine.

Ali sees the Board's use of the presentence report as his
opening. Several opinions of this court state that immi-
gration officials must stick to the indictment and record
of conviction when using an alien's convictions as the
basis of removal. See, e.g., *Hashish v. Gonzales*, 442 F.3d
572, 575 (7th Cir. 2006); *Padilla v. Gonzales*, 397 F.3d 1016,
1019 (7th Cir. 2005). The presentence report summarizes
information from the prosecutor, from witnesses, and
from the defendant's own mouth. Ali maintains that its
contents must be ignored when classifying an offense for
immigration purposes.

Our decisions in *Hashish*, *Padilla*, and similar cases apply
to immigration law the approach that *Taylor v. United
States*, 495 U.S. 575 (1990), and *Shepard v. United States*,
544 U.S. 13 (2005), adopt for recidivist enhancements in
federal criminal prosecutions. The Supreme Court gave
two principal reasons: in *Taylor* it stressed the benefits of
simple application, so that sentencing not be burdened by
a retrial of the original prosecution, and in *Shepard* it
stressed the allocation of tasks between judge and jury
under the sixth amendment. The Justices adopted a rule
that prevented the sentencing judge in the new case from
assuming a role that the Constitution assigns to the
jurors in the first case. Neither of these reasons applies

to immigration proceedings. They are not criminal prosecutions, so the sixth amendment and the doctrine of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), do not come into play. And how much time the agency wants to devote to the resolution of particular issues is, we should suppose, a question for the agency itself rather than the judiciary. See *Conteh v. Gonzales*, 461 F.3d 45 (1st Cir. 2006) (adopting for immigration cases what the court called a "modified categorical approach" rather than the rule that *Taylor* and *Shepard* devise for criminal prosecutions). This leaves decisions such as *Hashish* and *Padilla* hanging, for they do not discuss the differences between administrative and criminal proceedings. Meanwhile other panels have felt free to look beyond the charge and record of conviction to classify an offense as one of moral turpitude, see *Wei Cong Mei*, and still other panels have noted the inconsistent treatment within the court. See, e.g., *Abdelqadar v. Gonzales*, 413 F.3d 668, 671–72 (7th Cir. 2005).

Instead of starting with the procedures used in criminal prosecutions, we think it best to recognize that there are at least two distinct questions in immigration proceedings. The first is the fact of the prior conviction, which usually is the only thing that needs to be established for recidivist sentencing in a criminal prosecution. The second is the appropriate classification of that conviction, which may require additional information. The need to decide whether a crime is one of "moral turpitude" does not have a parallel in criminal cases and may require some additional information, since the charging papers that led to the prior conviction are not framed with such classifications in mind (for "moral turpitude" just isn't relevant to the criminal prosecution; it is not as if "turpitude" were an element of an offense). Other parts of

immigration law ask how much the victim lost from a crime (one example is 8 U.S.C. §1101(a)(43)(M)(i)), and again this is not an element of the crime but must be pinned down in the administrative proceeding.

For the first question—of what crime does the alien stand convicted?—the Immigration and Nationality Act supplies a rule.

> In any proceeding under this chapter, any of the following documents or records (or a certified copy of such an official document or record) shall constitute proof of a criminal conviction:
>
> (i) An official record of judgment and conviction.
>
> (ii) An official record of plea, verdict, and sentence.
>
> (iii) A docket entry from court records that indicates the existence of the conviction.
>
> (iv) Official minutes of a court proceeding or a transcript of a court hearing in which the court takes notice of the existence of the conviction.
>
> (v) An abstract of a record of conviction prepared by the court in which the conviction was entered, or by a State official associated with the State's repository of criminal justice records, that indicates the charge or section of law violated, the disposition of the case, the existence and date of conviction, and the sentence.
>
> (vi) Any document or record prepared by, or under the direction of, the court in

which the conviction was entered that indicates the existence of a conviction.

(vii) Any document or record attesting to the conviction that is maintained by an official of a State or Federal penal institution, which is the basis for that institution's authority to assume custody of the individual named in the record.

8 U.S.C. §1229a(c)(3)(B). This statute is similar to the approach of *Taylor* and *Shepard*, but to the extent of any difference the statute must control. As for the second question—whether the agency may go beyond the record of conviction to characterize or classify an offense—the Board has decided that additional evidence may be taken by the immigration judge when necessary. *Matter of Babaisakov*, 24 I.&N. Dec. 306 (2007).

Decisions such as *Hashish* and *Padilla*—in and out of this circuit[^]—predate (or do not notice) *Babaisakov* and require

---

[^] Most of the regional circuits have applied the *Taylor* and *Shepard* approach directly to immigration cases, without remarking the constitutional and statutory differences. See *Singh v. Department of Homeland Security*, 2008 U.S. App. LEXIS 4378 (2d Cir. Feb. 29, 2008); *Soliman v. Gonzales*, 419 F.3d 276 (4th Cir. 2005); *Garcia-Maldonado v. Gonzales*, 491 F.3d 284 (5th Cir. 2007); *Chanmouny v. Ashcroft*, 376 F.3d 810 (8th Cir. 2004); *Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1067 (9th Cir. 2007) (en banc); *Batrez Gradiz v. Gonzales*, 490 F.3d 1206 (10th Cir. 2007); *Vuksanovic v. Attorney General*, 439 F.3d 1308 (11th Cir. 2006). These decisions do not discuss the significance of 8 U.S.C. §1229a(c)(3)(B). The first circuit in *Conteh*, by contrast, adopted a "modified categorical" approach that it understands the

(continued...)

reexamination now that the Board has fully developed its own position, for administrative discretion belongs to the agency rather than to the court. See *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005). If our opinions had concluded that the immigration laws leave the Board with no course other than the one applied to criminal prosecutions by *Taylor* and *Shepard*, then the Board's view must yield. But that's not what *Hashish*, *Padilla*, and similar decisions say. They just carry over to immigration proceedings an approach familiar to the federal judiciary from criminal prosecutions. Given §1229a(c)(3)(B), which none of our prior opinions mentions, and *Babaisakov*, which is new, we now conclude that when deciding how to classify convictions under criteria that go beyond the criminal charge—such as the amount of the victim's loss, or whether the crime is one of "moral turpitude", the agency has the discretion to consider evidence beyond the charging papers and judgment of conviction. Because it resolves a disagreement within the circuit, this opinion has been circulated to all active judges under Circuit Rule 40(e). No judge favored a hearing en banc.

Section 1229a(c)(3)(B) does not include presentence reports among the documents that the agency may use to determine what crime Ali committed. See *Conteh*, 461 F.3d at 58–59. That is not, however, how the agency used the report. The judgment of conviction itself contains what is required to that end (the crime is conspiracy to

---

(...continued)

Board to prefer. *Conteh* relies substantially on §1229a(c)(3)(B). Ours is the first court of appeals to take account of both §1229a(c)(3)(B) and *Babaisakov*.

defraud the United States, in violation of §371). The agency used the presentence report to ensure that the judgment was not a mistake (in other words, to ensure that there really *was* deceit, rather than just a conspiracy to violate a record-keeping law) and to make the moral-turpitude classification, a matter that stands apart from the elements of the offense. Ali does not deny that, if the whole administrative record may be consulted, substantial evidence supports the IJ's decision (which the BIA joined) that his crime entailed concealment and deceit. That makes it a "crime involving moral turpitude", and the petition for review is denied.